Friedwardt Winterberg

5395 Goldenrod Drive

Reno Nevada 89511

775-849 2739



UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

Friedwardt Winterberg     Pro Se

PLAINTIFF

3:20-cv-00002

vs.

THE UNIVERSITY OF NEVADA BOARD OF REGENTS:

JASON GEDDES, MARK W. DOUBRAVA, PATRICK R. CARTER,

AMY J. CARVALHO, CAROL DEL CARLO, TREVOR HAYES,

SAM LIEBERMAN, CATHY McADOO, DONALD SYLVANTE MICHAEL Sr.,

JOHN T. MORAN, KEVIN J. PAGE, LAURA E. PERKINS, RICK TRACHOCK.

DEFENDANTS

COMPLAINT

1. Academic Tenure is a title of distinction which cannot be taken away except for criminal or sexual misconduct, or for not fulfilling the obligations the tenured faculty has been employed: Assigned teaching, research and assigned service. A teacher's tenure is a substantial, valuable and beneficial right, which cannot be taken away except for good cause. State v. District Court Fergus County, 128 Mont. 353,275 P.2d 209 (1954). Tenure has been defined as the right to which a teacher enjoys to continue in the position in which he has become elected or appointed. Klein v. Board of Education, 1 Ca, 2d 706, 37 P2d 74 (1934). Tenure is the right to continue to perform any duty which the plaintiff is capable of performing.

2. By the Nevada System of Higher Education (NSHE) Board of Regents, I, the plaintiff, received "permanent tenure as a member of the University Faculty, effective July 1, 1965", extended by the Board of Regents on December 1-2, 1994, at plaintiff's transfer from the DRI to UNR (exhibit1). On February 2, 2018, plaintiff's Tenure Contract was broken without notice by UNR

President Marc Johnson, and in June of the same year President Johnson's action was confirmed in a non-unanimous split vote by the Board of Regents.

3. To breach plaintiff's tenure contract, Agents of the Board of Regents: UNR President Marc Johnson, Executive Vice President and Provost Kevin Carman, Dean of the College of Science Jeff Thompson, and British Physics Department Chairman Dr. Paul Neill, conspired to replace plaintiff's tenured position with another British physicist, Dr. Thomas White, estimated 50 to 60 younger than the plaintiff, but with the same specialization as the plaintiff: Inertial Fusion Energy and Astrophysics. And in the fall of 2017 Dr. White was at teaching Physics 740 "fluid dynamics", plaintiff has been teaching since the time he was hired in 1963 (exhibit 2).

4. In a letter to the Nevada Equal Rights Commission Respondent wrote:"the recruitment process for Dr. Thomas White began in the December of 2016 to replace a faculty member who resigned in the 2016 Spring Semester and not to replace you in your position" (exhibit 3). The Faculty member the Respondent is referring to was Dr. Sentoku who is not a physicist but an engineer with a Dr. in engineering, who had accepted a full professorship in Japan. For this reason Dr. White could not be the replacement for Dr. Sentoku.

5. In the hearing just before my dismissal, four witnesses testified: 1. Former Vice Provost Professor Janet Vreeland, 2. Professor Stacy Burton, Vice Provost for Faculty Affairs, 3. Professor Paul Neill, Chair of the Department of Physics, 4. Professor Jeff Thompson, Dean College of Science.

6. In the hearing transcript page 35-36, witness Professor Janet Vreeland admits that she remembers I had returned all the personnel papers still in my possession (exhibit 4). Witness Professor Stacy Burton accused me on UNR0005-UNR0006, twice of stealing UNR property (exhibit 5), without naming any witnesses for this alleged criminal activity. And Professor Jeff could not provide a single witness for my alleged criminal activity.

7. Further evidence for a conspiracy to get me fired is provided by a Memorandum of Executive Vice President & Provost Kevin R. Carman dated April 11, 2017, where he makes the statement:" your teaching was Unsatisfactory, your research was Satisfactory by the narrowest of margins. I find no reason to change the overall rating of "unsatisfactory" for the 2016 evaluation period" (exhibit 6). Dr. Carman is a biologist for small ocean animals, certainly not a physicist. How could he make such an assessment about my professional competency? This is in stark contrast to a letter dated June 2 1970 by the Chairman of the US Atomic Energy Commission and Nobel Prize Winner Glenn Seaborg to University of Nevada System Chancellor Neill Humphrey (exhibit 7).

8. Without the proof of the alleged criminal behavior or sexual misconduct, the breach of my lifelong tenure contract has no legal foundation, but the replacement of my position with a much younger physicist is against Federal law: Smith/City of Jackson/missisipi 544 US 228 (2008). This must be also the reason for the suggested settlement proposal by the EEOC (exhibit 8) that I should be Rehired with Back-pay into a Similar Position As B and All Adverse Information Removed From My Personnel File (exhibit 8), but it was not accepted by Respondent

9. Through the original initiative by US President Truman, I was in 1959 invited to the United States as an expert in thermonuclear explosive devices [ for the details see Case Name: Winterberg v. The University of Nevada Reno; Case Number: 3:19-cv-00747-MMD-CLB]. The

importance of my work is explained in Exhibit 9, an excerpt from the Wikipedia Article "Inertial Confinement Fusion" where my original work done at the Max Planck Institute In Germany is seen at par with the super-secret work done at the same time at the Lawrence Livermore National Laboratory: To ignite a hydrogen bomb without a plutonium fission bomb trigger. This research has very recently led me to make basic discovery (published 2018 by Cambridge University Press), and how it could be developed into novel antiballistic missile defense against North Korea. The development something like that could be done at the Nevada Test Site, with a proposal I could have submitted through as a faculty member of UNR. It is for this reason that the statement by the British Physics Chair Dr. Paul Neill: "So at an early semester meeting, Professor Winterberg announced to graduate students that he was responsible for the research at the NTF, which I take exception to. And so that, I believe, is what started it" (exhibit 10). In urging with his ill informed knowledge the UNR administration that I be terminated, the British Physics Department Chairman Dr. Paul Neill, acted in the critical area of research regarding thermonuclear explosive devices, against the National Security interests of the United States of America.

I petition the Court to order my re-instatement as a tenured professor with back pay, the reimbursement of court costs and attorney fees, and punitive damages determined by the Court.

Signed *Friedwardt Winterberg*
Friedwardt Winterberg

January 2, 2020

UNIVERSITY OF NEVADA
RENO, NEVADA

OFFICE OF THE PRESIDENT

January 29, 1965

Professor Herbert C. Wells
Department of Engineering Science
Nevada Southern
4505 Maryland Parkway
Las Vegas, Nevada

Dear Professor Wells:

I am pleased to inform you that the Board of Regents of the University, at a meeting on January 23, 1965, approved my recommendation that you be appointed to permanent tenure as a member of the University Faculty, effective July 1, 1965, in accordance with the provisions of the University's Regulations on Tenure and Academic Freedom.

My sincere congratulations to you upon your achievement of this important professional recognition and status. I look forward to our continued association in the work of the University.

Every good wish.

Cordially yours,

Charles J. Armstrong
President

CJA:ro
cc: Dean William D. Carlson
    Academic Personnel

Nevada System of Higher Education

Home | Board of Regents | Institutions | Contact Us | Site Map
Your NSHE | Initiatives | News | Resources | Careers

- 1860
- 1870
- 1880
- 1890
- 1900
- 1910
- 1920
- 1930
- 1940
- 1950
- 1960
- 1970
- 1980
- 1990
- 2000

## UCCSN Board of Regents' Meeting Minutes
### December 1-2, 1994

12-01-1994

Pages 70-98

BOARD OF REGENTS

UNIVERSITY AND COMMUNITY COLLEGE SYSTEM OF NEVADA

December 1-2, 1994

The Board of Regents met on December 1-2, 1994 in Rooms 201 and 202, Donald Moyer Student Union, University of Nevada, Las Vegas.

Members present: Dr. James Eardley, Chairman

    Mrs. Shelley Berkley

    Dr. Jill Derby

    Mr. Joseph M. Foley

    Mrs. Dorothy S. Gallagher

    Mr. Madison Graves, II

    Dr. Lonnie Hammargren

    Mr. Daniel J. Klaich

    Mrs. Nancy Price

    Mrs. Carolyn M. Sparks

    Mrs. June F. Whitley

Others present: Chancellor Richard Jarvis

    President Anthony Calabro, WNCC

    President Joseph Crowley, UNR

(3) Approved the transfer of Dr. Friedwardt M. Winterberg's employment with tenure at the Desert Research Institute to employment with tenure at the University of Nevada, Reno.

(4) In accordance with Board of Regents' policy, Title 4, Chapter 3, Section 13.3, Sick Leave, approved the extended sick leave for David Wilkins, TMCC, from November 21, 1994 through June 30, 1995.

(5) Approved monies expended by the Thomas and Mack Center at UNLV for printing of a catalog in excess of the stated bid limit.

During late Summer, the Thomas and Mack Center solicited 3 phone quotes for printing the Fall catalog for the Rebel Store. Thomas and Mack personnel selected the lowest bidder (Burch Incorporated in Benton Harbor, Michigan) and agreed to pay $11,507 for the printing. This amount was considerably lower than either of the other bids, however, the Thomas and Mack Center failed to follow the bid process mandated by the Board of Regents involving the purchase of items costing $10,000 or more.

(6) Approved the authorization to utilize General Improvement Funds at WNCC in the amount of $5000 for the purpose of providing proctors and other services associated with placement testing.

This request will help ensure that students are placed for success. Consequently, completion and retention rates will be improved.

(7) Approved the authorization to utilize Capital Improve-

# Dr Thomas White

Department of Physics • University of Nevada, Reno, USA
Phone: (775)-682-6614 • E-Mail: tgwhite@unr.edu

## Research Interests

*Laboratory astrophysics, High energy density physics, Non-equilibrium plasmas, Density functional theory, Molecular dynamics, X-ray diffraction, Laser-matter interactions*

Dr Thomas White is currently an assistant professor at the University of Nevada, Reno. He specializes in the experimental and computational study of extreme states of matter relevant to astrophysical conditions and inertial fusion energy. He carried out his post-doctoral work and under the supervision Prof. Gianluca Gregori at the University of Oxford where he worked in the field of laboratory astrophysics, the simulation of astrophysical phenomena in the laboratory through high energy/intensity laser-matter interactions. Prior to this he worked in the Institute of Shock Physics at Imperial College London focusing on the behavior of materials under extreme pressures, typically created through ultra-high intensity laser-matter interactions in both the optical and X-ray regimes. He completed his doctorate in high energy density physics at Trinity College, University of Oxford, where he specialized in the electron-ion coupling process in high pressure and temperature systems.

## Education

DPhil. **Atomic and Laser Physics.** Trinity College, University of Oxford, UK

MPhys. **Physics with Research Placement.** University of Bath, UK (First Class with Honors)
My research placement was carried out at the Rutherford Appleton Laboratory, UK on "Performance studies of a pixel tracker in the Silicon Detector (SiD) concept for a future linear collider"

## Employment

| | | |
|---|---|---|
| Assistant Professor | Department of Physics, University of Nevada, Reno, USA | Sept 2017 - Present |
| Research Assistant | Department of Physics, University of Oxford, UK | Dec 2015 – Aug 2017 |
| Visiting Researcher | Institute of Shock Physics, Imperial College London, UK | Dec 2015 – Aug 2017 |
| Research Associate | Institute of Shock Physics, Imperial College London, UK | Feb 2014 – Dec 2015 |
| Student Researcher | Rutherford Appleton Laboratory, UK | July 2009 – Dec 2009 |

## Recent Experimental Research Campaigns

| | | |
|---|---|---|
| Observing ion acoustic modes in warm dense methane | LCLS, Stanford, USA | October 2017 |
| Femtosecond X-ray Thomson scattering from WDM | Gemini, RAL, UK | Sept 2016 |
| Dynamic material strength in heavy ion irradiated materials | Vulcan, RAL, UK | May 2016 |
| Low frequency structural dynamics of warm dense aluminum | LCLS, Stanford, USA | April 2016 |
| The statistical properties of supersonic turbulence | Vulcan, RAL, UK | March 2016 |
| Turbulent amplification of magnetic fields | Omega, USA | August 2016 |
| Ptycographical imaging of single dislocation motion in single crystal silicon | Diamond, UK | Nov 2015 |
| Femtosecond X-ray probing of HEDP matter on Astra Gemini | Gemini, RAL, UK | August 2014 |
| Dynamic X-ray imaging of pore collapse in shocked powder systems | Diamond, UK | March 2014 |
| Low frequency structural dynamics of warm dense matter | LCLS, Stanford, USA | June 2013 |
| First-principle compression measurements of shocks using x-ray scattering | LCLS, Stanford, USA | April 2013 |
| Diffraction from hot electron heated HOPG | Phelix Laser, GSI, Germany | May 2012 |
| Spectrally resolved x-ray scattering of laser shocked SiO2 | Titan Laser, Livermore, USA | April 2012 |
| X-ray scattering from liquid carbon heated by laser accelerated protons | Vulcan TAW, RAL, UK | Nov 2011 |

| | | |
|---|---|---|
| Diamond Light Source Proposal | Direct investigation of 3-D strain evolution in silicon single crystals using Bragg X-ray ptychography | Jan 2015 |
| Titan Laser Facility Proposal | Electron-Ion Equilibration in Warm Dense Tantalum | August 2014 |
| Conference travel and fee grant (£600) | Trinity College Oxford | Feb 2012 |
| Best student poster | 68th Scottish Universities Summer School in Physics | August 2011 |
| Ayliffe prize | Highest Undergraduate Marks, University of Bath, UK | July 2010 |
| Heathcoat Trust Bursary | The Heathcoat Trust | Sept 2006 |

Referee for "High Energy Density Physics", "Philosophical Magazine Letters" and "Modelling and Simulation in Materials Science and Engineering" international journals

## Outreach Work

| | | |
|---|---|---|
| IAPS4fusion2015 | "High speed photography" event | Sept 2015 |
| Imperial Festival | "How do airplanes fly?" Demonstration event | May 2015 |
| London Schools Activity Day | "Renewable Energy" talk and demonstration | Oct 2014 |

## Teaching and Supervision

| | |
|---|---|
| Teaching PHYS 404/604 *Computational Physics* at University of Nevada, Reno | Spring 2018 |
| Teaching PHYS 740 *Fluid Dynamics* at University of Nevada, Reno | Fall 2017 |
| Supervision of three summer UROP students | July-August 2015 |
|    *Identifying deformation mechanisms in molecular dynamics simulations of laser shocked matter* - Arkin Tikku and Michael Alves Silva | |
|    *3D Strain reconstruction and computer imaging* - Kwok Wan (BP Award) | |
| Supervision of two MSci student projects | Sept 2015 – March 2016 |
|    *Simulating extreme states of matter using molecular dynamics* - Christian Storm and Peter Shatwell | |
| Supervision of four ERASMUS student projects | March– Sept 2014 |
|    Quentin De Menech, Alexandre Wirtzler, Clément Zankoc, Gilles Tahan | |
| Supervision of first year UG project | March – June 2015 |
|    Kwok Wan and Bo Lan | |
| PhD candidate supervision | Sept 2015 – March 2016 |
|    *Grain-level Adiabatic Shear Localisation in Titanium Alloys at High Strain Rates* - Jack Patten | |

## Affiliations/Memberships

| | |
|---|---|
| Institute of Physics (IOP) – Member | Sept 2006 – Present |

## References

References available on request



NEVADA EQUAL RIGHTS COMMISSION

**Nevada Department of Employment, Training and Rehabilitation**

STEVE SISOLAK
Governor

DR. TIFFANY G. TYLER-GARNER
Director

KARA M. JENKINS
Administrator

3

November 18, 2019

Friedwardt Winterberg
5395 Goldenrod Drive
Reno, NV 89511                    via Email and U.S. mail

RE:   Friedwardt Winterberg   vs   University of Nevada Reno
      NERC No. 0108-19-0003R        EEOC No. 34B-2018-01471

Dear Mr. Winterberg:

Since the Commission's Informal Settlement Meeting Conference was unsuccessful, your case was placed into investigation and assigned to me. All questions and any information you submit regarding this case should now be directed to my attention. Ensure you label all correspondence with the case file name and case number.

The Respondent in this case has provided a response to your allegations of discrimination. The following information is not the Respondent's position in its entirety, but a summary of their position of which I may legally provide.

## RESPONDENT'S POSITION

The Respondent denies all allegations of discrimination on the basis of age, national origin and/or in retaliation. The Respondent states you were terminated due to policy violations after you were instructed to and refused to return confidential employee information.

In July 2017, Vice President of Faculty Affairs Stacy Burton became aware of policy violations committed by you, after you wrote an email to President Marc Johnson. In your memo, you used confidential employee information as exhibits, to which Ms. Burton instructed you to return the information to the Respondent. You refused this order and continued to use the information in support against other members of the university community.

Immediately after your refusal to comply with Mr. Burton's request, Mr. Johnson selected an administrative officer to conduct an investigation into the situation. This officer recommended a special hearing into your alleged conduct be held in front of a special hearing officer and a special hearing committee.

On January 30, 2018, the special hearing committee recommended to Mr. Johnson, consistent with the process under the Nevada System of Higher Education (NSHE) Code.

In a letter from Mr. Johnson addressed to you and dated for February 2, 2018, Mr. Johnson indicated that the special hearing officer made findings of fact that your conduct violated NSHE Code and the committee unanimously recommended you be terminated. As such, the decision was made to terminate your employment.

The Respondent also states that the recruitment process for Dr. Thomas White began in December 2016 to replace a faculty member who resigned in the 2016 Spring Semester and not to replace you in your position.

Lastly, the Respondent denies it retaliated against you for filing previous NERC Charge 0425-17-0187L (filed by you in February 13, 2017). In 2017, you were issued a written reprimand for insubordination and for violating the Respondent's syllabus policy. Additionally, the time span from when you filed NERC Charge 0425-17-0187L and your discharge date of February 2, 2018, is almost one year.

REQUEST FOR INFORMATION

This is a summary of what the Respondent provided in response to your charge and is not my finding. After review of your case, additional details are needed for the Commission's investigation. Please provide the information requested below to the Commission **by Tuesday, December 3, 2019.**

1. Provide a detailed response to the Respondent's position <u>in writing or typed</u>.

Please note that I am not permitted to contact any witness at the Respondent's place of business, nor may I contact any witness who is/was a member of Respondent's management without allowing the Respondent an opportunity to be present during management witness interviews.

If you have additional information that you would like to have included in the investigation, please provide it to me as soon as possible. This information may include completed witness statements, documentary evidence, or any additional evidence that would support your claim.

Thank you for your patience and cooperation during the case investigation process. If you have any questions regarding your case, you may contact me at (702) 486-7161.

Sincerely,

Roman Cervantes
Compliance Investigator II

```
 1   BY DR. WINTERBERG:
 2       Q      If I didn't return it, file charges against
 3   me.  Never was, never filed any insubordination
 4   charges against me.
 5              Can you explain that?  If I didn't return
 6   it, why didn't you file charges against me in 2013?
 7       A      Well, in 2013, when you would have been
 8   back on contract, I would no longer have been the vice
 9   provost.
10       Q      Then of course your successor would have to
11   make charges against me.
12              He's sitting here.
13       A      Secondly --
14       Q      Yeah
15       A      Secondly, as you said, it's my memory.
16   It's five years ago.  I never imagined I would be
17   sitting here.
18              And I have thought a great deal about this
19   over the last few weeks since I have been summoned to
20   appear here.
21              And I do have a vague recollection of you
22   returning documents.  And I also have a vague
23   recollection of asking you if these were all the
24   documents you have, and you saying yes, because you
25   were instructed to return all of the documents.  And
```

Page 36

```
 1   you chose to select to return Dr. Mancini's documents.
 2   That is my memory.
 3        Q    Your memory.  Okay, the witness relies on
 4   her memory.  Not on documented facts.
 5             THE HEARING OFFICER:  Do you have any other
 6   questions of Dr. Vreeland?
 7             DR. WINTERBERG:  No.  I see.  Okay.
 8   BY DR. WINTERBERG:
 9        Q    Do you remember there was an Audrey Casey
10   present when Mancini (indiscernible), which were
11   retained because --
12        A    No, I don't.
13        Q    You don't.  Well, of course, maybe if it
14   takes, maybe she could be subpoenaed, because she was
15   present there when I returned these documents to you.
16             But, of course, that's so many years back,
17   but when they're thinking of Audrey Casey was two, and
18   chance she made a comment there, about the Mancini
19   papers.  Only --
20             THE HEARING OFFICER:  Dr., Dr., this is the
21   time, Dr. Winterberg, this is the time to ask this
22   witness questions that you want her to testify to.
23   BY DR. WINTERBERG:
24        Q    All right.  You cannot remember.  That's
25   good.  There was no charge filed against me.  That's
```

states that "Personnel and payroll files of NSHE professional staff are confidential. Personnel and payroll records may only be released pursuant to the written authorization of the professional staff member or pursuant to a court order directing the release of the records that has been signed by a judge with jurisdiction over the matter, or to the U.S. Equal Employment Opportunity Commission, the Nevada Equal Rights Commission, or the U.S. Office of Civil Rights."

## Summary

The actions described above violate the NSHE Code and university policies. NSHE Code Chapter 6.2 includes the following as prohibited activity, all of which potentially apply with regard to Winterberg:

> The following conduct, being incompatible with the purposes of an academic community, is prohibited for all members of the faculty of the System, shall constitute cause for discipline and may lead to the procedures and disciplinary sanctions established in Section 6.3 of the Nevada System of Higher Education Code.
> (d) Insubordination.

>> *Including but not limited to repeated refusal to follow policy and direct defiance of chair, dean, vice provosts.*

> (f) Dishonesty.

>> *Including but not limited to false statements made to vice provosts regarding the return of confidential personnel documents.*

> (j) Personal or professional conduct which shows that the faculty member is unfit to remain in the faculty member's employment position or which has an ascertainable harmful or adverse effect on the efficiency of the faculty member's administrative unit.

>> *Including but not limited to refusing to act in accord with his 2011 legal settlement with the university, refusing to follow chair's direction regarding interaction with student workers, repeatedly questioning the chair's authority, wrongly accusing his chair of "moral turpitude" though he has been informed that Neill did not engage in wrongdoing, and wrongly distributing personnel documents to department faculty.*

> (n) The intentional disruption or unauthorized interruption of functions of the System, including but not limited to classes, convocations, lectures, meetings, recruiting interviews and social events, on or off premises of the System;

>> *Including but not limited to repeated seeking creation of ad hoc appeal processes to circumvent processes established in the NSHE Code and UNR Bylaws.*

> (o) Willful damage, destruction, defacement, theft or misappropriation of equipment or property belonging to, in the possession of or on premises occupied by, the System;

> *Including but not limited to the unauthorized retention of confidential personnel documents and distribution of them to unauthorized persons at the University and in the community.*

(s) Making an accusation which is intentionally false or is made with reckless disregard for the truth against any member of the System community by filing a complaint or charges under this Nevada System of Higher Education Code or under any applicable established grievance procedures in the System;

> *Including but not limited to filing reckless and baseless accusations against the department chair with the University president under the NSHE Code.*

(z) Willfully destroying, damaging, tampering, altering, stealing, misappropriating, or using without permission any system, program or file of the Nevada System of Higher Education;

> *Including but not limited to the unauthorized retention of confidential personnel documents and distribution of them to unauthorized persons at the University and in the community.*

(bb) Any other conduct which violates applicable stated prohibitions, policies, procedures, rules, regulations or bylaws of the Board of Regents or a System institution;

> *Including but not limited to bullying of the department chair, a violation of University Administrative Manual 2,040.*

(hh) Stalking. Stalking is defined to be when a person who, without lawful authority, willfully or maliciously engages in a course of conduct that would cause a reasonable person to feel terrorized, frightened, intimidated, harassed or fearful for the immediate safety of a family or household member, and that actually causes the victim to feel terrorized, frightened, intimidated, harassed or fearful for the immediate safety of a family or household member. Stalking includes but is not limited to:
    1. Engaging in a course of conduct directed at a specific person that would cause a reasonable person to:
        a. Fear for the person's safety or the safety of others; or
        b. Suffer substantial emotional distress.
    2. For the purpose of this definition:
        a. Course of conduct means two or more acts, including, but not limited to, acts in which the stalker directly, indirectly, or through third parties, by any action, method, device, or means follows, monitors, observes, surveils, threatens or communicates to or about, a person, or interferes with a person's property.
        b. Substantial emotional distress means significant mental suffering or anguish that may, but does not necessarily, require medical or other professional treatment or counseling.
        c. Reasonable person means a reasonable person under similar circumstances and with similar identities to the victim.



 University of Nevada, Reno

Executive Vice President & Provost

# MEMORANDUM

**To:** Friedwardt Winterberg

**From:** Kevin R. Carman
Executive Vice President and Provost

**Date:** April 11, 2017

**Subject:** Request for Reconsideration of 2016 Annual Evaluation

I have reviewed your request for reconsideration of your annual evaluation for 2016. In considering this request, I reviewed the following documents: your request for reconsideration and accompanying materials, including your annual activity report and evaluation for 2016, the chair's response dated April 3, 2017, and the dean's response dated April 9, 2017.

In light of this review, I support the conclusions of Chair Neill and Dean Thompson that your teaching was Unsatisfactory, your research was Satisfactory, and your service was Satisfactory by the narrowest of margins. I find no reason to change the overall rating of "unsatisfactory" for the 2016 evaluation period.

cc: Jeff Thompson, Dean
    Paul Neill, Chair

Office of the Provost
Clark Administration, Room 110
University of Nevada, Reno/0005
Reno, NV 89557-0005
(775) 784-1740 main
(775) 784-6220 fax
http://www.unr.edu/provost

 
UNITED STATES
ATOMIC ENERGY COMMISSION
WASHINGTON, D.C. 20545

JUN 2 1970

RECEIVED JUN 4 19..  Chancellor's Off..

Chancellor Neil Humphrey
The University of Nevada System
Office of the Chancellor
Suite 340
Arlington Towers
100 West Arlington Avenue
Reno, Nevada 89503

Dear Dr. Humphrey:

As you know, some work of Professor Friedwardt Winterberg has recently come to the Commission's attention. Following the Commission's review of several of Professor Winterberg's papers on the subject of certain laser studies, the Commission has concluded that it might be helpful to have Professor Winterberg visit the Lawrence Radiation Laboratory, Livermore for unclassified discussions on laser technology and on the possibility of entering into a mutually satisfactory arrangement for consulting with him from time to time.

We would expect that these arrangements should not impinge on Professor Winterberg's ability to fulfill his commitments to the University of Nevada.

Sincerely,

[signature]

Chairman

Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | [X] FEPA [X] EEOC | 34B-2018-01471 |
| **Nevada Equal Rights Commission** State or local Agency, if any | | and EEOC |

I believe the Respondent's actions violated Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act (ADEA) and Nevada State Law.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| X 1/4/2019   X J. Winterberg  Date            Charging Party Signature | SUBSCRIBED ... RE ME THIS DATE [Sign Here] |

# First conception

9

**In the US**

Inertial confinement fusion history can be traced back to the "Atoms For Peace" conference held in 1957 in Geneva. This was a large, international UN sponsored conference between the superpowers of the US and Russia. Among the many topics covered during the event, some thought was given to using a hydrogen bomb to heat a water-filled cavern. The resulting steam would then be used to power conventional generators, and thereby provide electrical power.[9]

This meeting led to the Operation Plowshare efforts, given this name in 1961. Three primary concepts were studied as part of Plowshare; energy generation under Project PACER, the use of large nuclear explosions for excavation, and as a sort of nuclear fracking for the natural gas industry. PACER was directly tested in December 1961 when the 3 kt Project Gnome device was emplaced in bedded salt in New Mexico. In spite of all theorizing and attempts to stop it, radioactive steam was released from the drill shaft, some distance from the test site. Further studies as part of PACER led to a number of engineered cavities replacing natural ones, but through this period the entire Plowshare efforts turned from bad to worse, especially after the failure of 1962's Sedan which released huge quantities of fallout. PACER nevertheless continued to receive some funding until 1975, when a 3rd party study demonstrated that the cost of electricity from PACER would be the equivalent to conventional nuclear plants with fuel costs over ten times as great as they were.[10]

Another outcome of the "Atoms For Peace" conference was to prompt John Nuckolls to start considering what happens on the fusion side of the bomb. When a fission bomb explodes, it releases X-Rays, which implodes the fusion side. This "secondary," was scaled down to very small size. His earliest work concerned the study of how small a fusion bomb could be made while still having a large "gain" to provide net energy output. This work suggested that at very small sizes, on the order of milligrams, very little energy would be needed to ignite it, much less than a fission "primary".[9] He proposed building, in effect, tiny all-fusion explosives using a tiny drop of D-T fuel suspended in the center of a metal shell, today known as a hohlraum. The shell provided the same effect as the bomb casing in an H-bomb, trapping x-rays inside so they irradiate the fuel. The main difference is that the x-rays would not be supplied by a primary within the shell, but some sort of external device that heated the shell from the outside until it was glowing in the x-ray region (see thermal radiation). The power would be delivered by a then-unidentified pulsed power source he referred to using bomb terminology, the "primary".[11]

The main advantage to this scheme is the efficiency of the fusion process at high densities. According to the Lawson criterion, the amount of energy needed to heat the D-T fuel to break-even conditions at ambient pressure is perhaps 100 times greater than the energy needed to compress it to a pressure that would deliver the same rate of fusion. So, in theory, the ICF approach would be dramatically more efficient in terms of gain.[11] This can be understood by considering the energy losses in a conventional scenario where the fuel is slowly heated, as in the case of magnetic fusion energy; the rate of energy loss to the environment is based on the temperature difference between the fuel and its surroundings, which continues to increase as the fuel is heated. In the ICF case, the entire hohlraum is filled with high-temperature radiation, limiting losses.[12]

- **In Germany**

Around the same time (in 1956) a meeting was organized at the Max Planck Institute in Germany by the fusion pioneer Carl Friedrich von Weizsäcker. At this meeting Friedwardt Winterberg proposed the non-fission ignition of a thermonuclear micro-explosion by a convergent shock wave driven with high explosives.[13] Further reference to Winterberg's work in Germany on nuclear micro explosions (mininukes) is contained in a declassified report of the former East German Stasi (Staatsicherheitsdienst).[14]

In 1964 Winterberg proposed that ignition could be achieved by an intense beam of microparticles accelerated to a velocity of 1000 km/s.[15] And in 1968, he proposed to use intense electron and ion beams, generated by Marx generators, for the same purpose.[16] The advantage of this proposal is that the generation of charged particle beams is not only less expensive than the generation of laser beams but also can entrap the charged fusion reaction products due to the strong self-magnetic beam field, drastically reducing the compression requirements for beam ignited cylindrical targets.

**In the USSR**

In 1967 research fellow Gurgen Askaryan published article with proposition to use focused laser beam in fusion lithium deuteride or deuterium.[17]

# Early research

Through the late 1950s, Nuckolls and collaborators at the Lawrence Livermore National Laboratory (LLNL) ran a number of computer simulations of the ICF concept. In early 1960 this produced a full simulation of the implosion of 1 mg of D-T fuel inside a dense shell. The simulation suggested that a 5 MJ power input to the hohlraum would produce 50 MJ of fusion output, a gain of 10. At the time the laser had not yet been invented, and a wide variety of possible drivers were considered, including pulsed power machines, charged particle accelerators, plasma guns, and hypervelocity pellet guns.[18]

Through the year two key theoretical advances were made. New simulations considered the timing of the energy delivered in the pulse, known as "pulse shaping", leading to better implosion. Additionally, the shell was made much larger and thinner, forming a thin shell as opposed to an almost solid ball. These two changes dramatically increased the efficiency of the implosion, and thereby greatly lowered the energy required to compress it. Using these improvements, it was calculated that a driver of about 1 MJ would be needed,[19] a five-fold improvement. Over the next two years several other theoretical advancements were proposed, notably Ray Kidder's development of an implosion system without a hohlraum, the so-called "direct drive" approach, and Stirling Colgate and Ron Zabawski's work on very small systems with as little as 1 μg of D-T fuel.[20]

The introduction of the laser in 1960 at Hughes Research Laboratories in California appeared to present a perfect driver mechanism. Starting in 1962, Livermore's director John S. Foster, Jr. and Edward Teller began a small-scale laser study effort directed toward the ICF approach. Even at this early stage the suitability of the ICF system for weapons research was well understood, and the primary reason for its ability to gain funding.[21] Over the next decade, LLNL made several small experimental devices for basic laser-plasma interaction studies.

```
 1   I thought that that was offensive.  And I pointed it
 2   out to him.
 3        Q    Do you recall the circumstances that led to
 4   that instruction?
 5        A    Well, this is related to, the initial issue
 6   was related to the NTF and the claim.
 7        Q    The NTF?
 8        A    Sorry.  Nevada Terawatt Facility.  It's a
 9   research facility that sits directly under the physics
10   department.  It's a component of the physics
11   department research activity.
12        Q    Okay.  Thank you.
13        A    So at an early semester meeting, Professor
14   Winterberg announced to graduate students that he was
15   responsible for the research at the NTF, which I take
16   exception to.  And so that, I believe, is what started
17   it.  But then it quickly moved on to issues related to
18   how he addresses female faculty members and also my
19   citizenship.
20        Q    Did you instruct him in the email of
21   September 26, 2017, to be more professional and
22   respectful with all members of the professional
23   committee?
24        A    I did.
25        Q    Did he agree to not do it anymore, or did
```